UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 4:14-cv-10071-JL King

RICHARD E. WARNER & JOHN W.
PARENTE, as Co-Personal Representatives of
the Estate of Joseph Ardolino II, &
JOSEPH E. ARDOLINO, Individually
　　　*Plaintiffs*,
vs.

CITY OF MARATHON, a political
subdivision of the State of Florida,
MICHAEL CINQUE, individually and
as a City of Marathon official, &
RALPH LUCIGNANO, individually and
as a City of Marathon official,
THE STUFFED PIG, INC., a Florida
Corporation, & CSV, INCORPORATED
　　　*Defendants*.

## 3rd Amended COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)

Plaintiffs/Richard E. Warner and John W. Parente, as Co-Personal Representatives

of the Estate of Joseph Ardolino II (the "*Estate*") and Plaintiff/Joseph E. Ardolino ("*Joe*"),

amend and restate their Complaint, under Fed. RCP11( c)(2) (no responsive pleading

having been filed) and sue Defendants/City of Marathon (the "*City*"), Michael Cinque,

individually and as a part-time City official ("*Cinque*") and Ralph Lucignano, individually

and as a part-time City official ("*Lucignano*"), The Stuffed Pig, Inc. ("*SP Inc.*") a Florida

corporation, and CSV, Incorporated ("*CSV*"), a Florida corporation, stating:

### Nature of the Action

1.  This is an action against Defendants for damages to the Estate and to Joe in

excess of $25,000:  A. from the City's temporary regulatory taking of Estate property and

unconstitutional and unwarranted searches of the Estate's property;  B. from the City, Cinque and Lucignano depriving the Estate of its constitutional and civil rights, and C. from their tortious interference with the Estate's contracts and favorable business relationships;  D. from CSV', Cinque's and SP Inc.'s trespass to land; and  E. by conspiracy between the City, Cinque and Lucignano.

2.  The City, Cinque and Lucignano wrongfully conspired to use the City's police and zoning powers, to harm the Estate and Joe, and deprive them of their Constitutionally-protected civil rights, all to benefit Cinque and Lucignano's private business interests.

3.  These wrongs damaged the Estate's Overseas property ("*the Overseas*") 3568–3574 Overseas Highway, Marathon, delayed its sale, and reduced its sales price.

4.  <u>Background</u>. Joseph Ardolino II (Joe's father--"*Joseph*") owned the Overseas when he died on November 11, 2005, subject to a lease and right of first refusal, and the tenants' instalment purchase of the Overseas' bar and package store license (the "*License*").

5.  Joseph operated the Overseas, beginning in the 1950s, as a package liquor store and cocktail lounge with live music, and apartment rentals.  After Joseph died, his Estate foreclosed on the License, and the lease ended, so that the Estate became the sole owner of the Overseas and its License.

6.  Exhibit "A" shows the Overseas, labeled "Overseas Property".

7.  The City, Cinque and Lucignano targeted the Overseas: (A) to eliminate it as competition with Lucignano's Marathon package store; and (B) to depress the Overseas' value, so that Cinque could buy it and combine it with the abutting Stuffed Pig restaurant

where Cinque has an interest (the "*Stuffed Pig*", labeled "Pig Property" on Exhibit A and owned by SP Inc.), and with the nearby Midtown Trailer Park property where Cinque also has an interest (the "*Trailer Property*", labeled "Pig Property Annex" and owned by CSV).

8.  Joseph died November 11, 2005.  Thereafter Cinque and Lucignano, as private citizens, conspired with each other and with the City, to devalue and shut down the Overseas and delay its sale, to serve Cinque's and Lucignano's <u>private</u> business interests.

9.  The City, Cinque and Lucignano conspired, and used the City's official <u>governmental</u> powers, to damage the Estate and Joe, to protect and benefit Cinque's and Lucignano's <u>private</u> business interests, and to depress the Overseas' price and keep the Estate from selling it to anyone but Cinque, SP Inc., CSV, or another Cinque affiliate.

10.  These actions, which the City enforced as policy, under color of state law and an improperly-noticed zoning ordinance amendment, deprived the Estate and Joe of their Constitutional and statutory rights and privileges, including impairing the Estate's License and its right to make and enforce contracts to sell the Overseas.  These are fundamental and well-established rights guaranteed by the United States and Florida Constitutions.

### The Parties

11.  <u>Joe & the Estate</u>.  Plaintiffs are Joe, an individual and Joseph's son, and the Co-Personal Representatives of the Estate, administered in Case 16th Cir. #06-CP-14-M, Middle Keys Division (the "*Estate Administration*").

12.  <u>The City</u>.  At all relevant times, Defendant/City was a political subdivision of the State of Florida in Monroe County.

13.  Cinque.

A. At all relevant times, Defendant/Cinque was a resident of Marathon, Monroe County, Florida, and a private businessman.

B.  At crucial times, Cinque was a part-time City official, and at all times was an official or unofficial City "policymaker".  From 2006 to 2013, Cinque served on the City's City Council or Planning Commission.

C.  Cinque is an owner or manager of the Stuffed Pig and the Trailer Property.

D.  Plaintiffs sue Cinque individually, and as a City official, because Cinque committed some of the wrongs claimed herein, in the course of his being a public official of the City and under color of Florida law--but outside of his scope of City "employment".

14.  Lucignano.

A. At all relevant times, Defendant/Lucignano was a resident of Marathon, Monroe County, Florida, and a private businessman.

B.  From 2009 to 2014, Lucignano was also a member of the City Planning Commission, a part-time position.

At all relevant times Lucignano was an unofficial City "policymaker".

C.  At all relevant times, Lucignano owned Marathon Liquors, Inc., a Florida Corporation. which owns and operates Marathon Liquors ("*Marathon Liquors*"), a package store at 5101 Overseas Highway, Marathon--about 1.5 miles east of the Overseas.

D.  Plaintiffs sue Lucignano individually, and as a City official, because Lucignano committed some of the wrongs claimed herein, in the course of his being a public official of the City and under color of Florida law--but outside of his scope of City "employment".

15.  S&P Inc.  Defendant/S& P Inc. is a Florida corporation, having an office and place of business at 3520 Overseas Highway, Marathon FL 33050, at the Stuffed Pig.  SP Inc. has owned the Stuffed Pig real property, since 1995.

16.  CSV, Inc.  Defendant/CSV, Incorporated is a Florida corporation, having an office and place of business at 2138 Harbor Drive, Marathon FL 33050.  CSV has owned the Trailer Property, since 1995.

17.  At all relevant times, the Overseas was the sole licensed Marathon package store west of Lucignano's Marathon Liquors.

## Jurisdiction, Venue & Waiver of Sovereign Immunity

18.  Venue.  Joseph died a Monroe County resident, and the Estate is administered in the 16th Circuit Court.  The City is in Monroe County and Cinque and Lucignano reside in Monroe County.  All actions, acts and proceedings alleged herein, occurred in Monroe County, so the action originated in Monroe County, under USDC SDFL Rule 3.1.

19.  Jurisdiction.  All damages suffered by Plaintiffs occurred in Monroe County.  Some claims herein are federal in nature, so Defendants removed this case from the 16th Circuit Court, to this Court.

20.  Counts II, III and IV hereof are civil claims under 42 U.S.C. §1983, for violations of the United States and Florida Constitutions—including deprivation of

substantive and procedural due process, the equal protection of the laws, the right to use and sell its License, and the right to contract to sell the Overseas, without interference.

21.  Fundamental, Established, Constitutionally-Protected Rights.  The Estate's fundamental Constitutional rights that the City, Cinque and Lucignano interfered with, are clearly established, City of Newport v. Fact Concerts, 453 US 247, 252, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) and Fact Concerts v. City of Newport, 626 F.2d 1060 (1st Cir. 1980).

The intangible value of a business (sometimes referred to as "good will") is a Florida property interest, protected by the [US] Constitution, Marrero v. City of Hialeah, 625 F. 2d 499, 514-517 (5th Cir. 1980), cert. den. 450 US 913, S.Ct. 1353, 67 L.Ed.2d 337 (1981), cited by Emory v. Peeler, 756 F.2d 1547, 1554 (11th Cir. 1985) and Eisenberg v. City of Miami Beach, 13-23620-CIV-Altonaga (SD Fla. March 3 & September 19, 2014).

The US Constitution's Art. I, §10 prohibits impairing contracts, and 42 U.S.C. §1981 (from the 1866 Civil Rights Act) protects the right to make and enforce contracts.

The fundamental right to make and enforce contracts was one of the civil rights protected by the later 14th Amendment to the US Constitution (the "*14th Amendment"),* General Building Contractors Assn. v. Pennsylvania, 458 US 375, 389 (1982), cited by McDonald v. City of Chicago, 561 US [  ], 130 S.Ct. 3020, 3024 (2010).

22.  State Law Waiver of Sovereign Immunity & 42 U. S. C. §1983 Liability.

A.  The City.  Fla. Stat. 768.28(1) & 768.28(9)(a) waive sovereign immunity for State law tort claims against the City--but only for non-legislative acts by the City and City officials when they acted *within their scope of employment* and did *not* act out of malice.

B.  Cinque & Lucignano.  Fla Stat. 768.28(9) waives sovereign immunity for City "officer[s], employees[s], or agent[s]" who "act in bad faith or with a malicious purpose", including Cinque and Lucignano in this case.

Cinque and Lucignano acted with conscious intent to harm the Estate.

Cinque and Lucignano acted as private businessmen in most of their actions against the Overseas, and not within the scope of their part-time positions in City government.

C.  Under 42 U.S.C. §1983, the Estate sues the City acting by its employees and officers, and Cinque and Lucignano as City policy-makers in this area, are sued for their "policy-making" action in adopting "ordinance[s]", and for the City's widespread custom or practice of official harassment of the Estate by City employees (in the course of their employment) which custom and practice the City's policymakers—including Cinque and Lucignano in particular--expressly or tacitly imposed on City employees.

These actions give rise to the City's, Cinque's and Lucignano's liability under 42 U.S.C. §1983, where sovereign immunity does not apply.

### Factual Allegations Common To All Counts:

### Background; Cinque's & Lucignano's Motives to Devalue & Close the Overseas

23.  Cinque and Lucignano (in their capacity as private citizens and businessmen) conspired with the City, and later with each other, to impair and damage the Overseas' liquor lounge, package store and apartment rental business, to discourage potential and actual buyers of the Overseas, all to benefit the City's favored private business interests—the Stuffed Pig and Marathon Liquors.

24.  Before Joseph died, Cinque had tried to buy the Overseas, but Joseph refused to negotiate seriously with Cinque.  This soured their relationship as neighbors.

25.  Exhibit A hereto shows the Overseas' land, labeled as "Overseas Property."

26.  <u>Lucignano's Motive</u>.  The Overseas' liquor store is *the last licensed liquor package store in Monroe Country heading west,* before the Seven Mile Bridge.  The next liquor store to the west is on Big Pine Key, 21 miles away.  If the Overseas' package store closed, Lucignano's Marathon Liquors would be the last liquor store before Big Pine Key.

27.  Cinque has had a substantial interest in the Stuffed Pig--just to the west of the Overseas, shown on Exhibit A, and labeled "The Pig Property."

28.  Cinque also has had a substantial interest in the Trailer Property northeast of the Overseas--several feet from being contiguous to the Overseas.  The Trailer Property is shown on Exhibit A and labeled "The Pig Property Annex."

29.  Cinque therefore was very interested in buying the Overseas.  If he owned the Overseas, Cinque's Stuffed Pig would get more parking.

Moreover, Cinque would need only to buy a narrow strip of land from one of the <u>two</u> remaining owners between the Trailer Property and the Overseas, to make <u>all three</u> properties "contiguous" for land-use purposes.

City land use ordinances let properties with greater acreage be developed with greater density.

30.  <u>Cinque's Private Motives to Devalue the Overseas:</u>

A.  Buying the Overseas would make the Stuffed Pig and Trailer Property worth

8

than they would be worth separately.

    B.  Destroying the Overseas' right to conduct its liquor business at the site, would make the Overseas worth less, so Cinque could buy it cheaply, either directly from the Estate, or when it was auctioned off to pay the Estate's federal estate taxes.

    C.  Cinque's buying the Overseas would mean that Cinque's sewer line (the "*Sewer Line*") running across the Overseas' property, from the Trailer Property to the Stuffed Pig, would only run over Cinque's property and a neighbor's easement.

Cinque's Sewer Line let him avoid the City's costly requirement that the Trailer Property connect with a City sewer.

    D.  Buying the Overseas would also give the Stuffed Pig additional parking.

    31.  <u>Lucignano's Private Motive to Close the Overseas</u>.

A. The Overseas' package store is the sole licensed package store in Marathon west of Marathon Liquors, so the Overseas has had a direct and substantial adverse competitive impact on Marathon Liquors' sales.

    B.  For years there has been no other package store west of Marathon Liquors, all the way to Big Pine Key, 21 miles to the west—except for the Overseas.

    32.  If the Overseas lost its License at its location, or was put out of the liquor store business, this would greatly benefit Marathon Liquors and Lucignano.  He so had a clear motive to destroy the Overseas' store—his only competition on Marathon's west end.

    33.  Cinque and Lucignano abused their public offices, and (as private businessmen) conspired between themselves and with the City, to wrongfully use the City's police

powers for their private benefit.

## CINQUE's SEWER LINE ACROSS COUNTY LAND--Winter 2005

34.  In December 2005, a few weeks after Joseph died, Cinque dug and installed his Sewer Line–beginning from his Trailer Property, across other private property, across the old Route 4A public right-of-way (the "*4A Right of Way*" which Monroe County--the "*County*"--then owned) and then to the Stuffed Pig.

Exhibit A shows this sewer line's general position, labeled "Cinque Sewer Line."

35.  The County later deeded the 4A Right of Way to the City, which abandoned the cross-hatched part of it to the Overseas, so the Sewer Line now crosses Overseas property.

36.  Cinque did this, without notice to, knowledge of, or consent or permission from, the Estate or the County, and without paying anything to the Estate, for so using its land.

37.  Neither the Estate nor the County knew about this trespass.  This was another reason to buy the Overseas, so that the Estate would not discover Cinque's Sewer Line.

38.  Cinque's Sewer Line let his Trailer Property avoid the City's Sewer Hookup requirement, but it remains  a wrongful trespass over the Estate's land.

39.  Though in April 2006, the City issued Permit P2005-1383 (the "*Permit*") to install his Sewer Line, neither the Estate nor the County signed the Permit's Application (the "*Application*").  Neither the County nor the City could grant a private easement over public land, without official action by the County Commission or City Council.

40.  To get the Permit, according to a City official, Cinque represented to the City that he had "an easement" from Joseph or the Estate as owner, to install the Sewer Line.

41.  Under Florida law, this type of granted easement must be created by a written

deed or grant, signed by the owner, with two witnesses.

42.  Cinque could not produce such an easement document, but the City never made him do so.  So the City wrongfully issued the Permit.

43.  Cinque, a licensed contractor, also dug the trench, more than three months before the City issued the Permit.

44.  <u>Concealment</u>.  The Permit was closed in 2007.  Until 2014, the Permit was not on the City's Building Department website--though the Permit and the Application are public documents under Florida's Government in the Sunshine Act.

The closed Permit is still not listed by the County Property Appraiser, for the Stuffed Pig or the Trailer Property.

45.  In October-November 2014, after months of public record requests, the City gave the Estate a copy of some of the Permit, the Application and related documents.

46.  <u>City Abandons the 4A Right-of-Way</u>.  In 2008, the Estate applied to have the City abandon part of the old 4A Right of Way, running through the Overseas property and adjoining lands, and shown on Exhibit A.

The City agreed to do so, after it acquired the 4A Right of Way from the County.

47.  The City Council's May 23, 2008 meeting led to the City's adopting its final October 28, 2008 Resolution 2008-44 (Exhibit "B"), to abandon to the Estate, the 4A Right of Way running through and next to the Overseas land, as cross-hatched on Exhibit A.

48.  The City Council's May 23, 2008 public discussions and its discussions with the Estate, did not refer to Cinque's trench and Sewer Line.  The City preliminarily voted

to abandon the 4A Right-of-Way, subject <u>only</u> to the Estate granting a routine public utility easement to the City, and routine <u>surface</u> access easements to adjacent owners.

49.  <u>The City Demands that the Estate Ratify the Sewer Line</u>.  Nonetheless, the City's final October 28, 2008 Resolution to abandon the 4A Right of Way, inserted the following additional <u>condition</u>, without notice to the Estate:

**3.  The applicants** [the Estate] ***will* grant an easement *recognizing the existing sewer line* from the Stuffed Pig restaurant until it is replaced by city sewer.**  [emphasis supplied]

50.  The City had never mentioned Cinque's "easement" or "sewer line" before.  This condition gave no notice of <u>where</u> the "sewer line" crossed the 4A Right of Way, or if it seriously encroached on the 4A Right of Way.

51.  When the Estate refused to comply with the City's private-easement demand, and only granted a public utility easement to the City and access to adjacent owners, the City abruptly abandoned its enacted condition for the Estate to recognize Cinque's "sewer line".

52.  The City's demand that the Estate *ratify* this <u>private</u> sewer line by granting it "an easement", shows the City's guilty knowledge that it had wrongfully issued the Permit, without all owners' consent.  It was an affirmative act to further the conspiracy by the City, Cinque and Lucignano, to use public City powers to damage the Overseas, the Estate and Joe--for Cinque's and Lucignano's private purposes and private gain.

53.  <u>Ongoing</u> Trespass.  CSV continued to pump waste water through the Sewer Line, across Estate property until at least 2013, when the Estate discovered the Sewer Line there.

**<u>The City Adopts Targeted Limitations On Package Stores & Lounges   2006 & 2007</u>**

54.  In October 2006, without required notice to the Estate, the City amended its Zoning Ordinance by Ordinance 2006-25 ("Exhibit "C").  This Ordinance prohibited bars and package liquor sales within 1,500 feet of <u>any</u> school, <u>and</u> within that same distance from any existing package liquor store, such as Marathon Liquors (the "*1,500 Foot Limit*").

55.  The Overseas is slightly less than 1,500 feet from Stanley Switlik *Elementary* School (the "*School*") in Marathon.

56.  The Overseas was the only <u>existing</u> package store in Marathon closer than 1,500 feet to a school.  There were other <u>existing</u> package stores in the City, including Marathon Liquors, but they were all more than 1,500 from a school.  (The 1,500 Foot Limit also kept <u>new</u> liquor stores from opening in the City.)

57.  The made the Overseas a "class of one"--treated differently from other existing package stores such as Marathon Liquors, without any rational basis--violating the 14th Amendment's Equal Protection Clause.

58.  There was no popular demand or campaign to require this unique, specialized and targeted 1,500 Foot Limit on package stores.  The Overseas had operated its package store for decades.  Keys Fisheries & Marina sold on-premises liquor even closer to the School than the Overseas.

59.  A newspaper recently quoted Lucignano as saying that the 1,500 Foot Limit was passed to "protect local businesses".  It certainly protected Marathon Liquors.

60.  The City's Planning Commission--where Cinque sat and voted against the Ordinance, *at that time*--unanimously rejected the Ordinance.

Nonetheless, the City Council enacted Ordinance 2006-25, without a dissenting vote. This shows Lucignano was a final City policymaker, in 2006, without holding office.

61. <u>The City Re-Zoned the Overseas, Without the Required Notice to the Estate.</u>

**The City failed to give the required notice of Ordinance 2006-25, and the 1,500 Foot Limit, to the Estate** or to any other affected owners.

Marathon Municipal Code ("*Code*") §108.09 required the City to mail written notice of the proposed Ordinance to the Estate. This put the City on notice of the Estate's Constitutional procedural Due Process right to be heard--but the City still gave the Estate no notice that it was going to impose the 1,500 Foot Limit on the Overseas.

62. This failure to give notice violated Code §108.09, and the Due Process clause of the 14th Amendment.

63. In 2007, the City updated its Land Development Regulations ("*LDRs*") by Ordinances ##2007-003 & 2007-014—again without giving the Estate any written notice.

64. New City Code §104.05(G) 1 (b) & (c) then codified the above Ordinances (the "*Ordinances*"), prohibiting package stores within 1,500 feet of any school.

65. Cinque, by then a City Council member, voted <u>for</u> this codification.

66. Until the16th Circuit Court overturned them, the Ordinances and new Code §104.05(G) made the Overseas liquor store and lounge, "non-conforming uses".

67. This restriction greatly reduced the price the Estate could get for the Overseas and delayed its sale, damaging the Estate and damaging Joe, who was forced to pay property taxes on the Overseas for two years, while its sale was delayed.

68.  By these undisclosed, intentional, overt acts and by other actions and inactions by other City officials, the City conspired with Lucignano and Cinque (in their capacities as private citizens) to target, depress and damage the Overseas, by making it "a nonconforming use" without notice to the Estate.

## Cinque Tries to Buy the Overseas in 2007

69.  In the fall of 2007, Cinque made an offer of $600,000 to purchase the Overseas, to Personal Representative Richard E. Warner.

70.  The Estate rejected this 2007 offer because it was made at the height of the real estate boom.  The Overseas was originally listed for sale at more than its $1,200,000 appraised value.

71.  Shortly thereafter, Cinque told Joe that Cinque would buy the Overseas cheaply later, when the Overseas was "sold for taxes."  Cinque and Lucignano were highly-motivated, and had enough "influence" with the City, to make that happen.

72.  In March 2008, the Overseas' tenant's lease was not extended and the tenant left the premises abruptly at the end of its lease term.  The Estate then foreclosed on the Overseas' liquor license, becoming the owner of the entire Overseas property and liquor businesses, including its liquor license.

73.  Thereafter, the Estate did not abandon the Overseas' liquor businesses, but pursued many avenues to improve the property and to lease and sell it, as part of the Estate's administration.

74.  The Estate engaged a real estate broker--American Caribbean Realty of

Marathon, Florida, through its agent Brenda Tarella ("*Tarella*")—to sell the Overseas.

75.  On March 25, 2009, to find out if the Overseas had any land-use issues, Tarella met with the City's Planning Director/George Garrett ("*Garrett*") and his staff.

76.  Tarella asked Garrett about all land-use issues for the Overseas.

77.  Tarella directly asked Garrett and staff if there were any limits on the Overseas' intended uses as a package store and liquor lounge, but Garrett and his staff said nothing.

78.  Garrett and his staff discussed many other details of limits on the Overseas, but they failed to mention <u>any</u> City package store and liquor lounge restrictions, though the Ordinances and their 1,500 Foot Limit had been in place for more than two years.

79.  On June 17, 2009 Garrett issued a letter to the Estate detailing the Overseas' Transferable Building Rights, but this letter never mentioned the 1,500 Foot Limit.

80.  These failures to disclose, continued the City's concealment of the Ordinances, and their 1,500 Foot Limit, from the Estate and its agent.

81.  The "*$1,000,000 Offer*".  In September 2009, the Estate executed a contract to sell the Overseas and its license for $1,000,000--by an "**As is**" contract with a 90-day due diligence period.  The potential buyers could withdraw their offer and have their deposit returned, at any time during this 90-day period, however, for any or no reason.

Tarella gave the City's phone number in her general Land Use Plan Disclosure.

82.  After an appraisal, the buyers withdrew their offer and got their deposit back, but they never mentioned the 1,500 Foot Limit.  When Tarella approached these potential buyers later, they verbally offered $500,000 for the Overseas, which was rejected.

83.  <u>The $750,000 Offer</u>.  Still relying on Garrett's omissions, on June 10, 2011, Tarella obtained a $750,000 cash offer (the "*$750,000 Offer*"--Exhibit "D") for the Overseas (the "*Foster Contract*"), from a ready, willing and able buyer ("*Foster*").

84.  When Tarella told Garrett about the Foster Contract in 2011, only then did Garrett finally tell the Estate and Tarella about the City's 1,500 Foot Limit.

85.  On July 27, 2011, Garrett--carrying out City policy to deprive the Overseas of using its License there--wrote (Exhibit "E"), refusing to allow the Overseas to transfer its License to Foster.

86.  Garrett's July 27, 2011 letter claimed the Overseas was "abandoned" and so was "nonconforming", because it was less than 1,500 feet from a school.

87.  Until the court overturned the Ordinances in 2012, the City prohibited the Overseas' existing package store and lounge businesses, at its favorable site.  This was an unconstitutional, uncompensated, temporary, regulatory taking of Overseas' property.

88.  The Estate objected because the Overseas was not abandoned and because *the City gave the Estate no notice of the proposed Ordinances* setting the 1,500 Foot Limit.

89.  The City denied these objections, and prohibited transferring the package store and lounge uses and License, to Foster.

90.  The Estate appealed the City Planning Director's letter, to the Marathon City Planning Commission, where Lucignano now sat as a voting member, but Lucignano refused to recuse himself for conflict of interest and voted against the Estate.

91.  The City Planning Commission affirmed Garrett's letter and denied the appeal.

92.  The Estate then appealed to the Marathon City Council, where Cinque sat as a member and the Mayor, but Cinque refused to recuse himself for conflict of interest, and voted against the Estate.

93.  The City Council denied the Estate's appeal in September 2011.

94.  The Estate had to appeal this ruling to the 16th Circuit Court, in & for Monroe County, by a *certiorari* Petition.

95.  On June 29, 2012, the 16th Circuit Court granted *certiorari* (Exhibit "F") and reversed the City's 1,500 Foot Limit for the Estate and the Overseas.  This exhausted the Estate's administrative and state law remedies.

96.  Ironically, because of the 16th Circuit Court's ruling, the Stuffed Pig later successfully applied to the City, to serve alcoholic beverages in the Stuffed Pig--even though it is closer to the School than the Overseas.

97.  Until the court ruled, though the City was a stranger to the sale, City officials told the Overseas' potential buyers—including Foster--that the Overseas would <u>not</u> be "grandfathered" in its lounge and package store uses, because of the 1,500 Foot Limit and because the City claimed that the Overseas had "abandoned" its liquor uses.

98.  <u>Damages</u>.  This position devastated the market for the Overseas.  During the Great Recession, the longer the Overseas' sale was delayed, the more Keys' real estate prices declined, and the more the Estate's unpaid estate taxes accrued additional interest.

99.  <u>Joe's Damages</u>.  To keep the Overseas from being "sold for taxes" (in Cinque's words), Joe voluntarily paid part of the Overseas' real property taxes, while Defendants

wrongfully delayed its sale.

The Estate has not been able to reimburse Joe for this.

100. <u>Motives</u>.  If the Overseas could not be sold, because of the City's open hostility, Cinque could buy the Overseas cheaply, and Lucignano could eliminate his competitor.

101.  <u>Foster Gives Up</u>.  As a result of the City's stated position on the liquor store, its open hostility to the Overseas, and the great delays in closing, in 2012 Foster refused to further extend his $750,000 Offer and withdrew it, so this sale failed.

102.  <u>Specific Damages to the Estate</u>.  The undisclosed Ordinances cost the Estate:

A.   at least the difference between the $1,000,000 Offer or Foster's $750,000 Offer, and the Overseas' final 2013 selling price of $475,000; *plus*

B.  the Overseas' operating and maintenance costs, real estate taxes and depreciation, while the sale was wrongfully delayed; *plus*

C.  the Estate's legal fees to fight the Ordinances and the Defendants' other wrongful actions; *plus*

D.  additional interest the Estate incurred to the IRS on unpaid federal estate taxes, from its inability to pay these taxes, without selling the Overseas, during the time the City, Cinque and Lucignano prevented its sale.

**Additional Damaging Actions by the City Against the Estate through 2013**

103.  Even after the 1,500 Foot Limit was voided against the Estate, City officials continued to try to block the sale of the Overseas.

104.  Since Joseph died in 2005, City building inspection officials repeatedly trespassed on the Overseas property and harassed the Estate's staff--usually without immediate prior complaint and without any search warrant or other legal authority.

105.  City inspectors often "inspected" and "red-tagged" the Overseas, without warning, without sufficient justification, and without authority to be on the property.

106.  Cinque ordered one such "inspection" and red-tagging on a Sunday morning.

107.  City inspectors repeatedly trespassed and cited the Overseas, in a pattern of harassment--to help keep the Estate from selling the Overseas to a buyer who could compete with Lucignano and Cinque in the alcoholic beverage and restaurant businesses.

108.  Many of the searches and repeated "inspections" of the Overseas by City officials violated Florida law, and the Fourth Amendment of the US Constitution.

109.  City Interference With the Overseas' Liquor Regulators.  In 2012, City officials requested the Overseas license file from the Florida Department of Alcoholic Beverages & Tobacco (the "*DABT*")—which administers the License for the State.

On information and belief, the City contacted the DABT, to interfere with the Estate's License.

110.  City Interference With the Overseas' Potential Buyers.  City officials denied the License's validity at the Overseas (without a futile, costly and time-consuming variance from the Ordinances), and refused the ministerial approval of the License's transfer to its buyers.  This damaged the License's value to the Estate, and to any potential buyer.

111.  As a result of these wrongful actions by the City, Lucignano and Cinque

between 2006 and 2013, the Estate could not find a buyer for the Overseas at a price that would pay all of the Estate's estate taxes, expenses and costs.

112.  This delay in finding a buyer caused the Overseas' selling price to decline even further, as the Marathon commercial real estate market deteriorated in 2008-2011.

113.  After the 16th Circuit Court struck down the 1,500 Foot Limit for the Estate in July 2012, the Estate finally found another buyer ("*O'Connell*")  in mid-2013.  O'Connell contracted (the "*O'Connell Contract*") to buy the Overseas for $475,000.

114.  From the time of the O'Connell Contract on May 13, 2013, until it closed in September, 2013, the City—at Cinque and Lucignano's direction--still interfered with and hindered that sale, by raising unnecessary and wrongful administrative impediments.

115.  In August and September of 2013, the City, at Lucignano's and Cinque's direction, intentionally tried to block the Estate's closing under the O'Connell Contract. Garrett required unprecedented actions by the Estate and O'Connell/the buyer, which were arbitrary and capricious, and thus intended to prevent the closing.

116.  The City used these unusual and unnecessary demands and technicalities, to try to prevent the O'Connell Contract from closing and to destroy the Estate's benefit of even this transaction.

117.  The City also imposed improper conditions and procedural impediments to the Estate's transfer of real property and alcoholic beverage permits.

118.  Though the City was a stranger to the transaction with O'Connell, the City even made a <u>title</u> objection to the Overseas' property's title.  This was far beyond the scope

of the City's role or official interest in the closing.

119.  The City's last-minute attempts to block the sale forced the Estate to again successfully petition the16th Circuit Court's Probate Division, to stop the City's wrongful attempts to stop the O'Connell Contract sale.  This caused the Estate unnecessary fees.

120.  All conditions precedent to this lawsuit to be performed by the Estate or by Joe— including the six-month notices by the Estate, required by Fla. Stat. §768.28, where there was no disposition of the Estate's claims--have occurred or have been performed.

121.  The Estate and Joe have had to hire counsel, and have agreed to pay their counsel, costs and reasonable fees for their services.

## Count I—"As Applied" Inverse, Temporary Regulatory Taking—the City

The Estate sues the City under the United States Constitution's 5th Amendment (the "*5th Amendment*") and Article X, §6 of the Florida Constitution, for taking the Estate's property by regulation without compensation.  The Estate also sues under 42 USC §1983.

122.  The Estate incorporates by reference the allegations in ¶¶ 2 through 121.

123.  The City's acts to take the Estate's property without compensation were performed under color of law—the City's permanent Ordinances and Garrett's stated position that the Overseas had abandoned its liquor store and lounge uses.

124.  The property taken from the Estate was its fundamental property right to conduct its liquor store and lounge business at the Overseas, an extremely-favorable location, and to sell it to close the Estate, Marrero v. City of Hialeah, 625 F. 2d, at 514-5.

125.  The Estate had vested legal rights to conduct its package store and lounge

businesses at the Overseas, *id.*, but the City never tried to use its eminent domain powers to take the Estate's property, and pay the Estate.

126.  The City's Ordinances and other, continuing "official" actions temporarily deprived the Estate of those vested rights, without compensating the Estate.

127.  The result of the City's regulatory actions was to temporarily and permanently destroy a major portion—in fact, substantially-all--of the Overseas' property's existing value and its economically viable use, Justice Stevens' dissenting opinion in 1st English Evang. Church of Glendale v. Co. of Los Angeles, 482 US 304, 329, 107 S.Ct. 2378, 2389, 96 L.Ed2d 631 (1978); & Corn v. Lauderdale Lakes, 95 So.2d 1066, 1073 (11th Cir. 1996).

128.  Destruction of Value.  Specifically, when the Estate first learned of the Ordinances, the Estate had a valid contract with Foster, to buy the Overseas for $750,000. After the Estate had the Ordinances declared invalid, but while the City's "regulatory" opposition still continued, the best the Estate could get for the Overseas was $475,000.

129.  Class of One.  The Ordinances prohibited only one existing package store—the Overseas.  The Ordinances were not enacted for any valid, rational public purpose, but were enacted solely to improperly benefit Cinque and Lucignano's private interests.

130.  The City enacted the Ordinances were enacted without procedural due process of law, under the 14th Amendment, because the City never gave the Estate the required advance notice of their enactment.

131.  The Estate exhausted its administrative remedies, by having the16th Circuit Court declare that the Ordinances were invalid as to the Estate, but that took much time,

during which the Estate could not sell the Overseas or conduct its package store or lounge businesses, and the commercial real estate market in Marathon declined further.

132.  The City's ongoing regulatory actions violated the 5th Amendment (incorporated to apply to the City, by the 14th Amendment) and the 14th Amendment, and violated Article X, §6 of the Florida Constitution, damaging the Estate, as set forth in ¶¶102, 119 and 121 hereof.

### Count II-- 42 USC §1983; Violating Estate's Civil Rights—The City

The Estate sues the City, under 42 USC §1983, for intentionally, maliciously and wrongfully, depriving the Estate of its civil rights, under color of state law, and conspiring with Lucignano and Cinque, to do so.

133.  The Estate incorporates by reference the allegations in ¶¶ 2 through 121 and in Count I.

134.  As set forth in ¶21 hereof, the clearly-established rights that Defendants deprived the Estate of, were:  the rights to conduct its *existing,* legal package store and lounge businesses on its property;  the use of its valid License;  the right to sell these businesses and the Estate's other property together;  and the right to be free of unreasonable unwarranted governmental searches.

135.  The City and its agents, acted under color of State and local law--under the Ordinances, under a generally understood City "policy" and under Cinque and Lucignano's direction--to prevent the Overseas from operating as a lounge and package store.

136.  Such was Cinque's and Lucignano's influence over City staff, that the City

Manager told another City Council member that Cinque and Lucignano will fire him, if he does not do what they told him.  Garrett reported to the City Manager.

137.  The City deprived the Estate of rights, privileges and immunities described in ¶21 hereof, secured to it by the United States and Florida Constitutions, including equal protection of the law and due process under the 14th Amendment, and its right to contract.

138.  The City and its officials were aware of these rights, and intentionally violated these rights, with the conscious intent and goal, of harming the Estate and its property.

139.  The City is civilly liable under 42 U.S.C. §1983, because it violated the United States and Florida Constitutions by depriving the Estate of equal protection under law, due process of law, freedom from unreasonable searches and other civil rights guaranteed by the United States Constitution, including the 4th, 5th and 14th Amendments.

140.  The City is liable because it intentionally, by its authorized officials:

A.  gave a permit for the Sewer Line, without making it a public record;

B.  failed to give the Estate its legally-required prior notice of the Ordinances;

C.  concealed the Ordinances from the Estate's agent/Tarella;

D.  continued to try to enforce the Ordinances, even after they had been invalidated, and the time to appeal had run, requiring another 16th Circuit Court proceeding;

E.  continually sent City inspectors to the Overseas; and

F.  interfered with the O'Connell and Foster Contracts, and (on information and belief) interfered with the $1,000,000 Offer and the License.

141.  The City's actions damaged the Estate, as set forth in ¶¶102, 119 and 121.

### Count III- <u>42 USC §1983; Violating Estate's Civil Rights—Cinque</u>

The Estate sues Cinque, under 42 USC §1983, for intentionally, maliciously and wrongfully, depriving the Estate of its civil rights, under color of state law, and, as a private business-owner, for conspiring with the City and Lucignano, to do so.

142.  The Estate incorporates its allegations in ¶¶ 2-121, and in Counts I and II.

143.  The clearly-Constitutionally-established rights that Cinque deprived, and conspired to deprive, the Estate of, were**:**  A. the right to conduct its *existing,* legal package store and lounge businesses on its property;  B. the use of its valid License;  C. its right to sell these businesses, the License and the Estate's other property, together, and  D. its right to be free of unreasonable searches, under the 4th Amendment.

144.  As a part-time City official and fulltime policymaker, Cinque acted under color of State and local law, under the Ordinances, to maliciously, intentionally damage the Estate, and advance his own, private interests, to prevent the Overseas from operating as a lounge and package store.

145.  In so acting, Cinque deprived the Estate of rights, privileges and immunities described in ¶21 hereof, secured to it by the United States and Florida Constitutions, including equal protection of the law and due process under the 14th Amendment, and its right to contract.

146.  As a part time City official and a private businessman, Cinque was aware of the Estate's rights: he was a principal intended beneficiary of their impairment.

147.  Cinque intentionally violated those rights, with the conscious intent and goal,

26

of harming the Estate and its property, for improper motives, including personal gain.

148.  Cinque, as a part-time City Official**:**

A.  voted for the codification of the 1,500 Foot Limit he had previously voted against, to benefit his private interests;

B.  refused to recuse himself, when the Ordinances and Garrett's interpretation of them were challenged by the Estate; and

C.  sent City inspectors to the Overseas, to harass it, in violation of the 4th Amendment, and (on information and belief) directed City officials to contact the BABT.

149.  As a private businessman, and <u>not</u> performing his public duties, Cinque conspired with the City and Lucignano, to devalue the Overseas, by keeping it from exercising its Constitutional right to operate a bar and package store, by (on information and belief) interfering with the License, and by interfering with the Estate's right to contract to sell the Overseas.

150.  Cinque's actions damaged the Estate, as set forth in ¶¶102, 119 and 121.

### Count IV- 42 USC §1983; Violating Estate's Civil Rights—Lucignano

The Estate sues Lucignano, under 42 USC §1983, for intentionally, maliciously and wrongfully, depriving the Estate of its civil rights, under color of state law, as a part-time public official, helping to set that policy as a private politician, and, as a private business-owner, for conspiring with the City and Cinque, to do so.

151.  The Estate incorporates by reference the allegations in ¶¶ 2 through 121, and in Counts I and II.

152.  The clearly-Constitutionally-established rights that Lucignano deprived the Estate of, were:  A. the rights to conduct its existing, legal package store and lounge businesses on its property;  B. the use of its valid License;  C. the right to sell these businesses, the License and the Estate's other property together, and  D. (on information and belief) the right to be free of unreasonable searches, under the 4th Amendment.

153.  As a member of the City's Planning Commission, Lucignano acted under color of State and local law, maliciously to advance his own, private interests, to prevent the Overseas from operating as a lounge and package store.  In so acting, Lucignano deprived the Estate of rights, privileges and immunities described in¶ 21 hereof, secured to the Estate by the United States and Florida Constitutions, including equal protection of the law and due process under the 14th Amendment, and the right to contract.

154.  As a part time City official and private businessman, Lucignano was aware of the Estate's rights**:** he was a principal intended beneficiary of their impairment.

155.  Lucignano intentionally violated those rights, with the conscious intent and goal, of harming the Estate and its property, for improper motives, including personal gain.

156.  Specifically, Lucignano, as a part-time City Official:

A. refused to recuse himself, when the Estate challenged the Ordinances; and

B.  (on information and belief) sent City inspectors repeatedly to the Overseas, to harass it, in violation of the 4th Amendment.

157.  As a private businessman and politician, and <u>not</u> in performance of his public duties, Lucignano conspired with the City and Cinque, to devalue the Overseas, by keeping

it from exercising its Constitutional right to operate as a bar and package store, and by (on information and belief) interfering with the License and the Estate's rights to contract to sell the Overseas.

158.  As a private politician, Lucignano influenced the City's elected officials to enact and enforce the 1,500 Foot Limit, with the conscious intent of preventing the Overseas from being sold to any party who would compete with Marathon Liquors.

159.  Cinque's actions damaged the Estate, as set forth in ¶¶102, 119 and 121.

**Count V-<u>Tortious Interference with Contract Rights—City, Cinque & Lucignano</u>**

The Estate and Joe sue the City (but not for enacting the Ordinances), Cinque and Lucignano, for intentionally, maliciously and wrongfully, interfering (on information and belief) with the $1,000,000 Offer, interfering with the Foster Contract to buy the Overseas for $750,000, and for conspiring to do so.

160.  Plaintiffs incorporate by reference the above allegations in ¶¶ 2 through 121.

161.  The City, Cinque and Lucignano intentionally interfered with the contractual relationship between the Estate and Foster, and with Foster's Contract for him to buy the Overseas for $750,000.

162.  On information and belief, the City also interfered with the $1,000,000 Offer.

163.  Garrett acted in his capacity as a City official, in doing so, at Cinque and Lucignano's direction.

164.  The above alleged intentional interference by the City, Cinque and Lucignano damaged the Estate and Joe, including damages set forth in ¶¶ 102, 119 and 121 hereof.

## Count VI--<u>Tortious Interference with Advantageous Business Relationships</u>

The Estate and Joe sue the City (but not for enacting the Ordinances), for intentionally, maliciously and wrongfully, interfering with the Estate's advantageous business relationships with the BABT and with potential buyers in listing the Overseas for sale, and sues the City, Cinque and Lucignano, for conspiring to do so.

165.  Plaintiffs incorporate by reference the above allegations in ¶¶ 2 through 121.

166.  The City intentionally interfered with the proposed sale of the Overseas, and with the Overseas' favorable business relationships, including the License by:

A. publicizing the Ordinances to the limited group of potential buyers for the Overseas, and telling the Estate's listing broker Tarella, about them--which Tarella was legally-required as a licensed Broker, to disclose to potential buyers;

B. making it known to Tarella and the real estate community at large, that the City was hostile to the Overseas' operation as a package store and lounge; and

C.  contacting the BABT, to (on information and belief) interfere with the License.

167.  The City, Cinque (in his capacity as a private businessman) and Lucignano (in his capacity as a private businessman and politician) conspired to interfere with these advantageous business relationships.

168.  The City's intentional interference—driven by Cinque and Lucignano-- proximately caused damage to the Estate and to Joe, by discouraging other potential buyers from purchasing the Overseas, and from causing delay in selling the Overseas at a reduced sales price, interest and legal fees, as set forth in ¶¶ 102, 119 and 121 hereof.

### Count VII—Trespass & Unjust Enrichment—Cinque, CSV & SP Inc.

The Estate sues Cinque, CSV & SP Inc., for intentional trespass on the Estate's land, and for unjust enrichment therefrom.

169.  The Estate incorporates by reference the above allegations in ¶¶ 2 through 121.

170.  Even if Cinque's Sewer Line was placed only across the later-abandoned 4A Right-of-Way, that trespass became continuous, when the Estate took title to that land, and Cinque and CSV continued to run sewerage over Overseas property to SP Inc's property.

171.  The Estate did not discover the buried Sewer Line's trespasses until 2013.

172.  Such trespass damaged the Estate's real property without permission, without paying the Estate for such trespasses, or for the Line's value to Cinque, CSV and SP Inc.

173.  CSV's continuing trespass--running waste across the Overseas' property for free—benefitted and unjustly enriched CSV, SP Inc. and Cinque.

174.  Accordingly, CSV, SP Inc. and Cinque are jointly and severally liable to the Estate for all damages from such trespass, and are further jointly and severally liable to the Estate for the fair market value of running the Sewer Line across the Estate's land.

### Count VIII--Conspiracy—City, Cinque & Lucignano

The Estate, and Joe for Counts V & VI, sue the City (but not for enacting the Ordinances, except in Count II), and Cinque and Lucignano, in their capacity as private businessmen, for conspiracy to commit the wrongs described in Counts II, III, IV, V & VI.

175.  Plaintiffs incorporate by reference the above allegations in ¶¶ 2 through 121, and in Counts I, II, III, IV, V and VI.

176.  For different though overlapping motives, the City, Cinque and Lucignano agreed and conspired to commit such wrongs against the Estate and (for Counts V and VI) against Joe.  This enhanced the damages that Plaintiffs suffered.

177.  Lucignano originally conspired with the City (or directed the City Council, as a person of unofficial political influence in Marathon) to pass the 1,500 Foot Limit, which Cinque had voted against on the City's Planning Commission.

178.  Nonetheless, by 2008, Cinque had agreed to support the 1,500 Foot Limit by voting for the Ordinances' codification.

179.  Cinque and Lucignano did <u>not</u> agree and conspire in their capacities as part-time City officials in the course of their official duties.  They conspired as full-time Marathon businessmen, with direct financial interests in ruining the Overseas, to promote their private interests.

180.  Lucignano did not go on the City Planning Commission, until 2009.  By that time, the 1,500 Foot Limit was codified into the City's ordinances.

181.  By agreeing, cooperating and conspiring for this common goal, Cinque and Lucignano increased the political influence they each had over the City's government.  Garrett's last-minute attempt to raise a title objection with O'Connell--a year after the Estate overturned the 1,500 Foot Limit-- shows that Cinque and Lucignano were still "in charge" of the City's relationship with the Overseas.

182.  Cinque and Lucignano showed their continuing agreement and coordination of efforts, when O'Connell, after buying the Overseas in 2013, asked for a meeting with

Cinque at the Stuffed Pig, "to bury the hatchet" with his new neighbor.

183.  Lucignano also attended that meeting, without notice to O'Connell.  There, Cinque and Lucignano both tried to dissuade O'Connell from operating a lounge or a liquor store at the Overseas.  Lucignano was still a member of the Planning Commission.

184.  At the time of this meeting, O'Connell had not yet received his building permits from the City.  These permits only arrived after the Estate filed this suit in 2014.

185.  This conspiracy magnified the Estate's and Joe's damages, as set forth above.

**Count IX—(Alternate) Negligence Under Fla. Stat. 768.28—The City**

The Estate and Joe alternatively sue the City, under Fla. Stat. 768.28, for negligently failing to notify the Estate of its enactment of the Ordinances, stating:

186.  Plaintiffs incorporate by reference the above allegations in ¶¶ 2 through 121.

187.  Section 108.09 of the City's Code, gave the City the duty to specifically notify the Estate about the proposed Ordinances in advance, which is a duty that was <u>not</u> owed to the public at large.

188.  The City failed to notify the Estate, so the Estate could oppose the enactment of the Ordinances, and so breached its duty to the Estate.

189.  If the City's failure to perform this duty was not intentional and malicious, it was certainly negligent.

190.  The City's negligent failure to notify the Estate of the proposed Ordinances damaged the Estate; by the Estate's losing the Foster Contract; by delaying the sale of the Overseas; by reducing the Overseas' ultimate purchase price; and by forcing the Estate to

pay or incur operating and maintenance expenses, real estate taxes, interest on estate taxes, legal fees to overturn the Ordinances, and other costs caused by such delays.

191.  This Count is warranted by a non-frivolous argument with a reasonable chance of success, to extend the existing Florida law of negligence, to a failure to give a required warning of a proposed zoning change that would materially adversely affect a party's rights and property.

### **Prayer for Relief**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as set forth above, and for the following relief:

A.  As to the City under Counts I, II and IX, a judgment for the damages actually suffered by the Estate, and as to the City under Count II, damages from the City, caused by the City's covertly enacting the Ordinances;

B.  As to the City, Cinque and Lucignano under Counts V, VI and VIII, all damages suffered by the Estate and by Joe (for Counts V and VI) in the loss and diminution of the value of the Overseas, costs and expenses, caused by the City, Cinque and Lucignano;

C.  As to Cinque under Count III, all damages suffered by the Estate in the loss and diminution of the value of the Overseas, and costs and expenses;

D.  As to Lucignano under Count IV, all damages suffered by the Estate in the loss and diminution of the value of the Overseas, and costs and expenses;

E.  As to CSV, Cinque and SP Inc., under Count VII, the damages suffered by the Estate, plus the value of the benefit to CSV, Cinque and SP Inc., from such trespass;

F.  Pre-Judgment and post-judgment interest as allowable by law;

G.  Reasonable attorneys' fees under 42 USC §1988(b) (for Counts I, II, III & IV),

and all costs of suit; and

H.  All other and further, appropriate relief.

**Demand for Jury Trial**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  November 17, 2014.                              Respectfully submitted,

     s/  John P. Fenner, Esq.
John P. Fenner Esq.,  Fla. Bar # 762938
email:  jfennerlaw@att.net
2840 NW Boca Raton Blvd., Suite 107
Boca Raton, FL 33431-6634
Phone (561) 750-5044 Fax 750-1586
Attorney for Personal Representatives
     and

  s/ Margaret A. Broz, Esq.
Margaret A. Broz, Esq., Fla. Bar #712507
email: peggy_broz@yahoo.com
11400 Overseas Highway, Suite 212
Marathon FL 33050
Ph.: (305) 743 8440 Fax: (305) 743 8558
Attorney for Estate & Joe

CERTIFICATE OF SERVICE

I certify a true copy of the foregoing was served by email on November 17, 2014,
on all counsel or parties of record in the Service List below.

s/ John P. Fenner, Esq.
John P. Fenner, Esq.

SERVICE LIST

Lynn M. Dannheisser, Esq.
lynn.dannheisser@gray-robinson.com
Gray Robinson, P.A.
1221 Brickell Ave., Suite 1600

35

Miami FL 33131
Phone:  305-416-6880  Fax:  305-416-6887
Attorneys for the City of Marathon

Jeffrey L. Hochman, Esq.,
hochman@jambg.com & ericksen@jambg.com
Hudson Carter Gill, Esq.
hgill@jambg.com & blanca@jambg.com
Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A.
2455 East Sunrise Blvd.
Fort Lauderdale FL 33304 –
Phone:  954-463-0100  Fax:  954-463-2444
Attorneys for Defendant City of Marathon

Oscar Edmund Marrero, Esq.
oem@marrerolegal.com & dinah@marrerolegal.com & lew@marrerolegal.com
Marrero & Wydler
2600 South Douglas Road Coral Gables FL 33134-6127
Phone:  305-446-5528  Fax:  305-446-0995
Attorney for Defendants Michael Cinque and Ralph Lucignano

--Hugh J. Morgan, Esq.
hugh@hjmorganlaw.com
317 Whitehead Street
Key West FL 33040
Phone 305-296-5676;  Fax 305-296-4331
Co-counsel for Defendant/Ralph Lucignano

--Christopher B. Waldera, Esq.
cwaldera@aol.com
11300 Overseas Highway, Suite 1
Marathon FL 33050-34433
Phone 305-289-2223;  Fax 305-2249

36